Filed 7/8/26  P. v. Ross CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LESLY CORNELL ROSS,<br><br>Defendant and Appellant. | C101364<br><br>(Super. Ct. No. 22FE004360) |

A jury convicted defendant Lesly Cornell Ross of 11 counts of lewd and lascivious acts upon three victims under the age of 14 and one count of forcible lewd and lascivious acts upon one of the victims using force, fear, or duress.

Defendant raises a variety of challenges on appeal.  He argues that there was insufficient evidence of duress or fear and that the trial court erred in admitting evidence of Child Sexual Abuse Accommodation Syndrome (CSAAS) and of his personal sex life. Defendant also raises several claims of instructional error and prosecutorial misconduct.

We affirm the judgment.

1

FACTS AND HISTORY OF THE PROCEEDINGS

Molestation of A.D.

A.D. was born in 1996. She was 28 years old when she testified at defendant's trial.

Defendant lived with A.D. and her family when she was young. At the time, A.D. did not know whether defendant was her biological father, but she called him "dad." Defendant sexually molested A.D. on several occasions when she was about seven years old.

On one such occasion, A.D. woke up in the middle of the night as defendant was licking her vagina. Defendant stood next to her bed, and he told her it was "okay" before putting one of his hands on her breast and one on her vagina. A.D.'s genital area was wet. When defendant placed his fingers into her vagina, A.D. "squirmed" a little bit; defendant ran out of the room and closed the door behind him.

A.D. went to the bathroom, wiped herself, and hid her underwear behind the toilet. She thought she had urinated on herself and did not want her mother to find out. Afterwards, defendant told A.D. to come over to him on the couch. Defendant put A.D. on his lap between his legs, placed his hands on her hips, and rubbed her body against his penis. After about a minute, defendant told A.D. to get onto her knees. Defendant moved A.D.'s head towards his penis and told her to "Lick like a lollipop." A.D. sucked the tip of defendant's penis for about 15 seconds before she began to cry. She told him she did not like it.

A.D. then sat and watched cartoons until her mother came and told her to go back to bed. She did not tell her mother what happened.

Another time, when A.D.'s mother was gone, defendant told A.D. to lie down on the couch, and he licked her vagina for 15 to 20 seconds. Afterwards, he told her to get on her stomach. Defendant tried to put his penis into A.D.'s anus. When she said it hurt,

2

defendant put Vaseline on his penis. A.D. tried to move away from him, but defendant told her to lie back down. Defendant tried again to put his penis into A.D.'s anus. When she said again that it hurt, defendant tried to put his penis into her vagina. A.D. said, "ouch," so defendant rubbed his penis against her vagina and legs instead. This lasted for "a while" until A.D.'s mother knocked at the door. Defendant told A.D. to go to the bathroom, and she did. She saw a white sticky substance on her leg. A.D. did not tell her mother.

On another occasion, defendant showed A.D. a pornography video in his bedroom. As they watched the video, defendant told A.D. that she was "supposed to learn." Defendant put his hands in A.D.'s pants and kissed her on the mouth with his tongue. A.D. tried to pull away but defendant pulled her closer as he rubbed her vagina. This continued until A.D.'s mother came through the front door of the home with groceries. The video was turned off. A.D. pulled her pants up, and both she and defendant left to help with the groceries. A.D. did not tell her mother because the sexual behavior by defendant was "just normal" to A.D. at that point. She was also afraid of getting into trouble.

Eventually, A.D. told her older cousin about the sexual assaults. Her cousin, in turn, told A.D.'s family and they called the police. A.D. was interviewed on May 3, 2004, when she was eight years old by police officer Mitchel Marquez. A.D. purposely did not provide all the details of the assaults in her initial police interview.

A.D. underwent a sexual assault examination the same day, which revealed that her anus was slightly dilated. One possible explanation for the dilation is trauma from penile penetration.

Years later, when A.D. was about 14 or 15 years old, she met M.D.—her sister's stepsister. Defendant was M.D.'s stepfather at the time. The girls were outside playing and M.D. kept grabbing "people's butt." When A.D. asked M.D. about this behavior, M.D. said that defendant "was doing it to her." A.D. did not tell anyone about this

3

because she had been called a liar by defendant and her grandmother as a child and she did not want to get involved.

A.D. was interviewed again about the sexual assaults in September 2022 by Detective Melanie Marino. Detective Marino asked A.D. about the statements she made in 2004, and whether she wanted to provide any additional information. A.D. provided new and additional information to Detective Marino about the sexual assaults.

A.D. explained that she did not provide all the information in her initial interview because she struggled to focus at her young age, she was nervous, and she had trouble remembering certain details at the time. She had also "conditioned" herself to forget what happened, was tired of answering questions, and was afraid. Her grandmother blamed her for defendant's behavior, which made A.D. worry she would get into trouble if she told anyone. As an adult, A.D. found it easier to discuss the incidents than it had been when she was a child.

Molestation of M.D.

M.D. was born in 2001. She was 22 years old when she testified at defendant's trial. Defendant was in a relationship with M.D.'s mother for more than five years starting when M.D. was six or seven years old.

Defendant was M.D.'s stepfather, though they did not get along because defendant was neither loving nor caring towards M.D.; she described defendant as "not a nice person." He spoke "angrily" all the time and yelled at M.D. and her mother. Defendant provided food for M.D. but he was "mainly there for punishment." Defendant gave M.D. a "whooping" if she misbehaved; this made her feel scared and hurt. However, her mother told her that she "would have to" listen to defendant.

Defendant attempted to sexually molest M.D. several times between the ages of seven and nine. M.D. does not remember how big she was when defendant molested her, but defendant was "bigger than [her]" at the time.

4

One time, after M.D.'s mother left for work in the morning, defendant went into M.D.'s room, locked the door, put Cocoa Butter on his penis, and tried to take the covers off her. M.D. was wrapped up "burrito style" in her bed, so defendant was unable to get the blankets off her. Defendant pulled up his pants, unlocked the door, and left. M.D. did not tell anyone about this incident because she was scared and did not think anyone would believe her.

Defendant returned to M.D.'s room a few nights later. He walked into her room, locked the door, pulled his pants and underwear down, put lotion on his penis, and tried to take the covers off M.D. Once again, defendant was unsuccessful in removing the blankets. Defendant pulled his pants up, unlocked the door, and left. M.D. was too scared to call for help.

On another occasion, M.D. woke up in the middle of the night to get water. Her mother was at work. As she walked back to her room, defendant was standing in the doorway; he told M.D. to come to his room and get onto his bed. M.D. did as she was told because she was scared defendant "might do something" if she did not listen to him.

M.D. walked into the bedroom. The bed was situated at the far end of the room against the wall. M.D. got onto the center of the king- or queen-sized bed and lay down on her side with her elbow propping her up. Her baby sister was sleeping a "couple of inches" away. Defendant stood at the end of the bed about a "foot away or so" from M.D.

Defendant pulled his pants down, took his erect penis out, and asked M.D. to suck his penis. M.D. was scared; he had never asked her to do that before. When she told him that she did not want to do it, defendant offered to pay her money. M.D. did not "really react" to that offer but defendant continued to try to persuade her to orally copulate him in exchange for money.

5

M.D. orally copulated defendant as he stood next to the bed with his hands at his side. She was scared as she did it because she was "[h]oping he would not ask [her] to do anything else."

M.D. could not recall whether defendant touched her, moved his body, said anything to her, or made any noises as she orally copulated him. She stopped after a couple of minutes because she did not like it. Defendant gave her five dollars and she returned to her room.

M.D. did not tell anyone about the incident for at least a few days, but one day at school, she urinated in her pants. When her mother came to bring a change of clothes, M.D. told her what happened. After school, M.D., her mother, and defendant discussed the accusations. Defendant was angry and told M.D.'s mother not to believe her. Defendant left because he was concerned the police would be called; they were not.

M.D.'s mother checked her vagina for injuries. M.D. told her mother that she made it up because she felt like her mother did not believe her.

In 2018, when M.D. was in high school, her mother asked her whether she had previously been honest about defendant; M.D. confirmed that she was. M.D. told law enforcement what happened, though she omitted the part about talking with defendant and her mother because her mother told her not to tell them.

Molestation of K.D.

K.D. was born in 1996. She was 27 years old when she testified at defendant's trial. Growing up, K.D. lived in group housing where she, and the other children she lived with, were trafficked and used for prostitution. K.D. ran away from the group homes on several occasions and would typically make her way home or back to the group home by getting rides.

When K.D. was 13 years old, she and her friend were looking to get a ride from San Francisco to her friend's house in Hayward. After walking around, K.D. and her

6

friend got into defendant's car.  The girls told him they wanted to go to Hayward.  K.D. fell asleep during the drive and when she woke up, they were in Sacramento.  K.D. felt nervous and scared because she thought she would be forced "to do something [she] d[idn't] want to do."

The girls stayed overnight at a home in Sacramento.  Defendant drove K.D. to Watt Avenue the next morning because he wanted "to engage in sexual activity for money."  K.D. did not want to, and she tried to get away from defendant.  K.D. ended up at a restaurant, but defendant found her.  K.D. told defendant that she wanted to go home but he took her to a motel instead.  K.D. told defendant she did not want to have sex, but they did have sex twice.  K.D. did not scream for help at the motel because, in her experience, no one comes to help her when she screams.  K.D. went to sleep afterwards which was a "coping mechanism" for her when she was stressed; sleeping allowed her to not to think about it.

Defendant was still in the room when K.D. went to sleep, but he was gone when she woke up.  She was naked.  Defendant eventually returned to the motel with her clothes that had been cleaned.

K.D. was taken to a school but did not remember how she got there.  The police were called, and K.D. told them about what happened with defendant.

K.D. underwent a sexual assault examination, which revealed that defendant's DNA was found in a sample of sperm taken from K.D.'s vagina.

CSAAS Testimony

Licensed clinical psychologist Tiffany Anderson treats children who have experienced sexual abuse.  Dr. Anderson explained that adults have preconceived notions about how they expect a child to behave after they have been sexually abused.  Adults commonly believe that children who have been sexually abused will disclose the abuse

7

shortly after it occurs. However, children often delay the disclosure for weeks, months, or years, if they ever disclose at all. Indeed, delayed disclosure is "quite common."

Dr. Anderson explained that there are "different variables" for why a child may not disclose the abuse or may wait to do so. These variables include the type of relationship between the child and perpetrator; fear of retribution; normalization of the sexual behavior; disassociation during the abuse, which makes recall difficult; and age of the child when the abuse occurs.

When a child does disclose, they may not necessarily disclose all the information at once. They may initially share some information and then later decide to include more if they feel safe. Because of this, disclosure can take a while and may continue into adulthood.

Defense

Defendant testified on his own behalf. He denied all allegations made by A.D. and M.D.

Defendant remembered K.D. but denied forcing her to have sex. Defendant said that he was driving a female friend to work when K.D. ran in front his car and begged him for help because she had been kidnapped. Defendant picked her up and K.D. said she wanted to get a room at a motel. Defendant got a room at a Motel 6.

Defendant went to the room with K.D. and noticed that she smelled like urine, so he offered to wash her clothes. Defendant went home, washed K.D.'s underwear, and returned to the motel later that night. Defendant drank, smoked marijuana, and took a Xanax. He laid down on the bed; K.D. joined him without pants or underwear on and lay her head on his chest. Defendant "blacked out" and could not "confirm or deny, what did or did not happen." When he woke up the next morning, he took K.D. to the light rail station and never saw her again.

<u>Verdict and Sentence</u>

A jury found defendant guilty of nine counts of lewd and lascivious acts upon A.D. (Pen. Code, § 288, subd. (a), statutory section citations that follow are to the Penal Code unless otherwise stated); two counts of lewd and lascivious acts upon K.D.; and one count of forcible lewd and lascivious acts upon M.D. with the use of force, fear, or duress (§ 288, subd. (b)(1)). The jury found true that defendant engaged in substantial sexual conduct (§ 1203.066, subd. (a)(8)) and that he committed lewd and lascivious acts against two or more victims (§§ 667.61, subd. (e)(4), 1203.066, subd. (a)(7)). Defendant was sentenced to a determinate term of 20 years and an indeterminate term of 75 years to life.

Defendant appeals.

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Defendant contends there is insufficient evidence that he committed forcible lewd and lascivious acts upon M.D. by duress or fear. According to defendant, M.D. orally copulated him "only" because she wanted the money he offered and not because of any duress or fear.

The People disagree and contend that M.D. orally copulated defendant under both duress and fear. Although M.D. wanted the money offered to her by defendant, the People argue that she simultaneously acted out of fear of defendant and under duress.

We agree with the People's argument.

<u>Applicable Law</u>

When considering a claim of insufficient evidence, we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence." ' " (*People v. Clements* (2022) 75 Cal.App.5th 276, 298, quoting

*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the [fact finder's] verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142, quoting *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) When reviewing for substantial evidence, we do not reevaluate witness credibility because "[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see also *People v. Ramirez* (2002) 13 Cal.5th 997, 1118.)

Section 288, subdivision (b)(1) prohibits lewd acts on a child under the age of 14, by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. To sustain this charge, the state must prove (1) the defendant willfully touched a child's body or caused the child to touch their own body or someone else's; (2) using force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else; (3) with intent of arousing, appealing to, or gratifying his lust, passions, or sexual desires, and; (4) the child victim was under 14 years old. (CALCRIM No. 1111.)

Duress is " 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004-1005, 1010.) This definition is "objective in nature and not dependent on the response exhibited by a particular victim." (*People v. Soto* (2011) 51 Cal.4th 229, 246.) To evaluate duress, we look at "[t]he totality of the circumstances includ[ing] the victim's age, her relationship to the perpetrator, threats to harm the victim, physically controlling the victim when the victim attempts to resist, warnings to the victim that revealing the molestation would result in jeopardizing the family, and the

10

relative physical vulnerability of the child." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072.)

Duress can take the " 'form of psychological coercion to get someone else to do something.' " (*People v. Soto, supra*, 51 Cal.4th at p. 243; see *People v. Cochran* (2002) 103 Cal.App.4th 8, 15, overruled on other grounds in *Soto,* at p. 248, fn. 12.) It "can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes." (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005.) Duress also can be established by "a defendant's attempt to isolate the victim and increase or maintain her vulnerability to his assaults." (*Cochran,* at p. 15.) "When the victim is young and is molested by her father in the family home, duress will be present *in all but the rarest cases.*" (*People v. Thomas, supra*, 15 Cal.App.5th at pp. 1072-1073, italics added.)

<u>Sufficient Evidence of Duress</u>

On this record, we have age disparity, size difference, and a familial relationship in which defendant occupied a position of dominance and authority over M.D. Defendant was an adult stepfather living in the home with M.D. at the time she was molested between the ages of seven and nine. Defendant was neither loving nor caring towards M.D., and she described him as "not a nice person." He often spoke angrily and yelled at M.D. and her mother. M.D.'s mother required M.D. to listen to defendant, and he would "whoop" her when she misbehaved. Defendant was "mainly there for punishment." This evidence supports the inference that defendant would discipline M.D. if she refused to acquiesce when he sexually abused her. And in fact, M.D. explained that she went into defendant's bedroom the night of the sexual assaults because she was scared defendant "might do something" if she did not listen to him.

M.D. was also scared when defendant asked her to orally copulate him, and she told him that she did not want to do it. Her mother was not home, and her baby sister was

11

asleep nearby on the same bed. M.D. was situated on her side in the center of the large bed while defendant stood at the foot of the bed with his erect penis exposed and his pants and underwear down. Defendant would not take no for an answer and offered to pay M.D. money for the sexual act. M.D. did not "really react" to the offer for money but defendant continued to try to persuade her to orally copulate him for cash. M.D. eventually acquiesced and said she was scared during the act because she was "[h]oping he would not ask [her] to do anything else."

This evidence shows that M.D. did not comply with defendant's demand for oral sex only because of the offer of money. While she may have been motivated by defendant's offer of money, based on her difficult relationship with defendant and his "whoopings" when she misbehaved, M.D. also feared what might happen to her if she did not obey defendant. These simultaneous motivations are enough to support the jury's verdict. Indeed, "[d]esire for reward and fear of punishment may coexist. A person, particularly a child, might act from dual motivations—to receive a reward and to avoid harm. As long as the total circumstances support an inference that the victims' participation was impelled, at least partly, by an implied threat, we do not think the factual basis is eliminated by evidence of other motivating factors." (*People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1580.)

Such is the case here. The record demonstrates that M.D. may have been motivated to accede to defendant's demands that she orally copulate him by offers of money but was also motivated by fear of punishment. We therefore conclude that sufficient evidence supports the finding that defendant coerced M.D. to orally copulate him through implied threat of force, violence, danger, hardship or retribution.

Because there is sufficient evidence of duress, we find it unnecessary to address defendant's claim of insufficient evidence of forcible lewd and lascivious acts using fear of immediate and unlawful bodily injury.

12

*II*

*CSAAS Testimony*

Defendant raises four challenges to the admission of Dr. Anderson's testimony regarding CSAAS: (1) CSAAS evidence is "inherently unreliable"; (2) Dr. Anderson's testimony was not admissible under Evidence Code section 801 because lay jurors—like those on defendant's jury—have no misconceptions about children's reactions to sexual abuse; (3) the low probative value of the CSAAS evidence was substantially outweighed by the danger of undue prejudice to defendant under Evidence Code section 352; and (4) CALCRIM No. 1193 did not properly instruct the jury on the use of Dr. Anderson's testimony. Defendant claims that these errors violated his right to due process and were prejudicial.

We reject each of these claims.

<u>CSAAS is Admissible</u>

Defendant argues that the trial court abused its discretion by admitting Dr. Anderson's testimony because CSAAS evidence is "inherently unreliable" as it is premised on the assumption that a child was actually abused. Defendant invites this court to "reevaluate the reliability of CSAAS as a tool for helping jurors ascertain the truth of child sexual abuse allegations."

We review a trial court's decision to admit expert opinion testimony for an abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) Under the abuse of discretion standard, we review the trial court's legal conclusions de novo and may reverse the trial court's application of the law to the facts only if we find that the court acted in an arbitrary and capricious manner. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.)

Defendant's position that the trial court abused its discretion by admitting CSAAS evidence because it is inherently unreliable is foreclosed by binding California Supreme

13

Court precedent. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), the Supreme Court ruled that although expert testimony about CSAAS "is not admissible to prove that the complaining witness has in fact been sexually abused[,] it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with [the child's] testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' " (*Id*. at pp. 1300-1301, fn. omitted.) Based on *McAlpin*, California appellate courts have held that when offered for this purpose, CSAAS expert testimony is sufficiently reliable to be admissible. (E.g., *People v. Ramirez* (2023) 98 Cal.App.5th 175, 214-216; *People v. Munch* (2020) 52 Cal.App.5th 464, 472-473.)

Defendant acknowledges *McAlpin* but contends we should reconsider the issue and adopt the reasoning from a relatively small number of out-of-state courts that he claims have concluded the evidence is irrelevant and inadmissible for any purpose. We would decline to revisit or deviate from *McAlpin* even if we could. That Supreme Court decision is binding on all lower courts in this state. (*Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455.) Disagreement by other jurisdictions does not alter binding California case law. (*Ibid*.; see *People v. Munch, supra*, 52 Cal.App.5th at p. 468 [rejecting a similar invitation to revisit or deviate from *McAlpin*].) Accordingly, we adhere to precedent from our state Supreme Court that CSAAS evidence is generally admissible for the limited purposes for which it was admitted in the instant case. We therefore find no abuse of discretion in the trial court's admission of Dr. Anderson's testimony.

<u>Admissibility Under Evidence Code Section 801</u>

Defendant next contends that the CSAAS testimony did not meet the criteria for admissibility under Evidence Code section 801 because it failed to provide information to the jury that is beyond their common experience.  To support this point, defendant cites to one study from 2005 that shows jurors are aware that sexually abused children may delay their disclosure.  (Citing London et al, Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways That Children Tell? (2005) vol 11, No. 1, Psychology, Public Policy, and Law 194, 220.)

The court in *People v. Munch, supra*, 52 Cal.App.5th 464, rejected a similar challenge to CSAAS evidence based on the same article cited by defendant.  As that court explained, the " 'conclusion regarding recantation rates has itself been challenged by other professionals who have likewise reviewed the empirical data.' " (*Id*. at p. 470.) The court went on to cite several research articles finding child victims of sexual abuse commonly recant.  (*Id*. at pp. 470-471.)  Like the *Munch* court, we decline to hold the existence of one article critical of certain aspects of CSAAS—which article itself has been criticized—invalidates *McAlpin* and renders CSAAS evidence inadmissible as a matter of law.

Defendant alternatively argues that even if CSAAS is generally admissible in child sexual abuse cases, it was not warranted here where the jurors "collectively made it clear" that they did not believe the myth that a sexually abused child would immediately disclose and/or that their failure to disclose indicates their story is false.

During voir dire, the prosecutor asked whether anyone on the venire would "automatically disregard the testimony of a child sexual assault victim simply because they did not want to tell someone right away because they had some reason they were not willing or able to talk about it?  Would anyone here disregard their testimony?"  No hands were raised and the prosecutor heard "[v]erbal nos."  The prosecutor then asked

15

whether everyone understood "that there may be many reasons a child or adult may not feel comfortable in running and telling someone immediately after it happen[ed], why they may wait a day, weeks, months, or even years before they report? Does everyone understand there may be many reasons why that is the case?" The prospective jurors said, "Yes." Finally, the prosecutor asked whether anyone "fe[lt] like if the child or adult does not report right away, then automatically they're lying?" No hands were raised.

Defendant concludes that the collective answers to these voir dire questions show that the CSAAS evidence did not meet the admissibility criteria under Evidence Code section 801. We disagree.

Evidence Code section 801, subdivision (a), permits testimony from an expert that is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."

The prospective juror responses to the prosecutor's generalized questions did not necessarily establish that the jury understood the nuances and varying reactions to abuse that CSAAS expert testimony is offered to explain. Even if the prospective jurors had some level of understanding of behavior in children who are sexually abused, this is not enough to deem the CSAAS evidence inadmissible under Evidence Code section 801. Indeed, " '[t]he jury need not be wholly ignorant of the subject matter of the [CSAAS testimony] in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information ....' " (*McAlpin, supra*, 53 Cal.3d at pp. 1299-1300.)

Moreover, "expert testimony has been held admissible in a range of cases where the general subject matter of the expert's testimony may be familiar to the average juror, yet critical aspects of that subject 'are not likely to be fully known to or understood by the jury.' " (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 753.)

16

In *Sotelo-Urena*, expert testimony regarding "homeless violence" was held admissible even though homelessness is " 'not a subject beyond the knowledge of the average citizen' " and despite the possibility of jurors having "a rudimentary understanding of the hazards of life on the street." (*People v. Sotelo-Urena, supra,* 4 Cal.App.5th at p. 753.) The same rationale was employed regarding CSAAS testimony in *People v. Lapenias* (2021) 67 Cal.App.5th 162: "while some prospective jurors in this case may have been aware of some aspects of CSAAS, it is not clear from the record that all the empaneled jurors were aware of the entire spectrum of CSAAS .... Moreover, even if we were to assume that all the empaneled jurors were fully aware of all five components of CSAAS, we would then find Dr. Carmichael's testimony to be merely cumulative and therefore not prejudicial." (*Lapenias*, at pp. 172-173.)

Accordingly, Dr. Anderson's testimony met the criteria for admissibility required by Evidence Code section 801.

Admissibility Under Evidence Code Section 352

Defendant also argues that the probative value of the CSAAS testimony is substantially outweighed by the danger of undue prejudice to him and therefore should have been excluded under Evidence Code section 352. According to defendant, the probative value of the CSAAS evidence is low because the jurors held no relevant misconceptions about disclosure of child sexual abuse for which the testimony would have assisted in their understanding of the issues at trial. Defendant also claims that the potential danger of undue prejudice to him was "great" because CSAAS evidence may be misunderstood and misapplied by a jury.

Evidence Code section 352 allows a trial court "in its discretion" to exclude "evidence if its probative value is substantially outweighed by the probability that its admission will ... create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "For this purpose, 'prejudicial' is not synonymous with

17

'damaging,' but refers instead to evidence that ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal. 4th 1100, 1121.)

We review a trial court's decision to admit evidence over an Evidence Code section 352 objection for abuse of discretion. (*People v. Powell* (2018) 5 Cal.5th 921, 961.) In evaluating whether there was an abuse of discretion, a " ' "decision will not be reversed merely because reasonable people might disagree." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) A "trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Ibid*.)

Here, defendant denied all the allegations against him, so the credibility of the victims was a focal point of this case. The CSAAS evidence was therefore highly probative. (Evid. Code, § 210 ["Relevant evidence" includes "evidence relevant to the credibility of a witness…"].) The prejudicial value, if any, was slight in comparison. Defendant was convicted of 11 sex crimes against three different children under the age of 14. As Division 3 of the Fourth District Court of Appeal put it, "the prejudicial impact of the relatively benign CSAAS testimony was likely to have paled in comparison to the charged [sex crimes] conduct." (*People v. Lapenias, supra,* 67 Cal.App.5th at p. 174.)

We are not persuaded by defendant's argument that the *Lapenias* court "undersold" the danger of CSAAS evidence because of its susceptibility to misunderstanding and misapplication by a jury. As we explain in further detail in the next section of this opinion, the jury was instructed on the proper application of Dr. Anderson's testimony on CSAAS. We must presume the jury followed this instruction. (See *People v. Cain* (1995) 10 Cal.4th 1, 34.) Thus, there was no danger in this case that the jury misunderstood or misapplied the CSAAS evidence because—with CALCRIM No. 1192—it understood how to use, and how not to use, the CSAAS evidence.

18

Consequently, the trial court's decision to admit the CSAAS evidence was not so irrational or arbitrary that no reasonable person could agree. There was no abuse of discretion.

### The Jury was Properly Instructed with CALCRIM No. 1193

Defendant claims that CALCRIM No. 1193 erroneously authorized the jury to consider the CSAAS testimony as evidence of his guilt. Specifically, defendant argues that the instruction failed to comply with *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735, which requires a jury to be admonished that a CSAAS expert's testimony should not be used to determine whether the victims' claims were true and that the CSAAS evidence is admissible only to show that the victims' reactions to the sexual abuse were not inconsistent with having been molested.

Although defendant did not object to CALCRIM No. 1193 below, we nevertheless consider his appellate claims based on his dual contentions that his substantial rights were affected by the erroneous instruction (§ 1259) and that he received ineffective assistance of counsel for his attorney's failure to object to the instruction. (*People v. Hardy* (1992) 2 Cal.4th 86, 209.)

The jury was twice instructed with CALCRIM No. 1193—once immediately following Dr. Anderson's testimony and again after the close of evidence. The jury was told, "You have heard testimony from Dr. Tiffany Anderson regarding child sexual abuse accommodation syndrome. Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. Dr. Tiffany Anderson's testimony about child sexual abuse accommodation syndrome is not evidence that a defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not

19

[the victims'] conduct was consistent with the conduct of someone who has been molested in evaluating the believability of the alleged victims."

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*Ibid*.)

It is not reasonably likely that the jurors here understood CALCRIM No. 1193 as permitting the use of Dr. Anderson's testimony for the improper purpose of proving that defendant sexually abused the victims. "CALCRIM No. 1193 informs jurors that they may use CSAAS evidence to evaluate whether the alleged victim's behavior, which may appear inconsistent with being molested, was actually not inconsistent with the behavior of a child sexual abuse victim." (*People v. Ramirez, supra*, 98 Cal.App.5th at p. 219.) As noted in *Ramirez*, "CSAAS evidence is relevant and admissible when an alleged victim's credibility has been attacked. [Citation.]" (*Ibid*.) The victims' credibility was attacked in this case.

Defendant argues that CALCRIM 1193 permitted the jury to consider CSAAS evidence in evaluating the believability of the victims' testimony, therefore overlooking the second requirement in *Sanchez* that the jury be admonished that CSAAS evidence is admissible only to show that the victims' reactions to the sexual abuse were not inconsistent with having been molested. In defendant's view, CALCRIM No. 1193 "improperly allows the jury to consider CSAAS evidence to determine whether the victim was truthful in her allegations, and in turn whether the defendant was guilty." However, as defendant acknowledges multiple courts have rejected similar challenges to

20

CALCRIM 1193. (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 816.) There is no reason for us to depart from our sister circuits on this point. We agree with those holdings.

Accordingly, we conclude that defendant's claim is without merit. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504 [rejecting contention that CALCRIM No. 1193 allows a jury to use CSAAS testimony as proof that the victim was molested]; accord, *People v. Munch, supra*, 52 Cal.App.5th at pp. 473-474; *People v. Lapenias, supra*, 67 Cal.App.5th at pp. 175-176.)

Because there was no error in instructing the jury pursuant to CALCRIM No. 1193, we reject defendant's alternative argument that his trial counsel was ineffective for failing to object to that instruction. (*People v. Poslof* (2005) 126 Cal.App.4th 92, 99.)

Defendant Received a Fair Trial

Defendant argues that the admission of the CSAAS evidence rendered his trial fundamentally unfair and violated his federal right to due process of law. He also contends that because CALCRIM No. 1193 allowed the jurors to conclude that he was guilty, it reduced the prosecutor's burden of proof also in violation of his right to due process.

"The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) As we have explained, the CSAAS evidence was relevant to the issues presented in the case and, as it was properly limited by CALCRIM No. 1193, it was not prejudicial. (See *People v. Patino* (1994) 26 Cal.App.4th 1737, 1747; see also *Estelle v. McGuire* (1991) 502 U.S. 62, 69-70 [the admission of relevant evidence of battered child syndrome does not violate the due process clause of the Fourteenth Amendment].)

21

## III

### Admission of Defendant's Sex Life and Preferences

During cross-examination, the prosecutor asked defendant about pornography, masturbation, and his preferred physical characteristics in sexual partners. Defendant contends that the trial court abused its discretion by permitting the prosecutor to ask him these questions because the information about his personal sex life and preferences lacked probative value and was unduly prejudicial under Evidence Code section 352. He argues the admission of this evidence rendered his trial fundamentally unfair in violation of his right to due process.

The People argue that the questions were relevant to corroborate the testimony of the victims and, in any event, the trial court imposed appropriate limits on the line of questioning. The People further contend that the evidence was not unduly prejudicial to defendant because the nature of the charges was far more inflammatory than the brief line of questioning by the prosecutor on cross-examination.

Additional Background

During cross examination, the prosecutor asked defendant questions about his personal sex life and preferences. The discussion began when defendant confirmed that he had spanked A.D. when she found pornography in his bedroom. The prosecutor followed up on this point by asking details about where defendant's pornography was located in the home as well as questions about where and when defendant watched it. Defendant was also asked whether he masturbated, but the trial court sustained defense counsel's objection on relevance under Evidence Code section 352. Instead, the prosecutor asked whether defendant used lotion when he masturbated followed by a series of questions regarding whether defendant owned any lotions, Vaseline, or cocoa butter, and what they were used for. When the prosecutor asked more questions

22

specifically about masturbation, the trial court sustained another Evidence Code section 352 objection by defense counsel.

Later, the prosecutor asked defendant what "type of sex" he preferred. Defendant described his preferences over an objection by defense counsel. The prosecutor then asked whether defendant had a specific type of girl that he liked to have sex with, but the defense attorney's Evidence Code section 352 objection was sustained for lack of foundation. The prosecutor then asked defendant more pointed questions on his preferred physical characteristics in sexual partners including race, size, and hair type. The trial court eventually instructed the prosecutor to move on.

<u>The Relevance of the Prosecutor's Questions was not Substantially Outweighed by Undue Prejudice to Defendant</u>

The trial court's decision to allow the prosecutor to question defendant about his sexual history and preferences was neither arbitrary, capricious, nor irrational. (*People v. Carmony, supra,* 33 Cal.4th at p. 377.) Defendant was charged with 11 counts of lewd and lascivious acts with children under the age of 14. To prove these offenses, the prosecutor had to establish that defendant touched the victims' bodies with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child. (§ 288, subd. (a).) As the statutory language demonstrates, this is a specific intent crime. (*People v. Whitham* (1995) 38 Cal.App.4th 1282, 1290 [§ 288].)

The evidence elicited by the prosecutor on cross-examination about defendant's sexual preferences was admitted for the purpose of meeting these statutory requirements. A.D. said that defendant touched her while they watched his pornography videos in his bedroom. Both A.D. and M.D. said that defendant put Vaseline and Cocoa Butter on his penis. Thus, whether defendant watched pornography and/or used Vaseline or other lotion when he masturbated, and whether he was attracted to women who resembled the victims, was all relevant to prove whether defendant touched the victims with the intent

23

to arouse, appeal to, or gratify his own lust, passions, or sexual desires. (Evid. Code, § 210 [relevant evidence has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].)

Additionally, as we previously explained, the credibility of the victims was central to this case because defendant denied all the allegations made against him. The questions asked by the prosecutor about pornography, lotions, and physical attraction were therefore also relevant to establish the victims' credibility. (Evid. Code, § 210 [relevant evidence also includes evidence relevant to the credibility of a witness].)

For these reasons, the prosecutor's questions were highly probative. They were not, however, unduly prejudicial. The limited information the prosecutor elicited from defendant about his sexual preferences was not particularly inflammatory compared to the 11 charged crimes against three child victims. (*People v. Kipp, supra,* 26 Cal. 4th at p. 1121.) Consequently, this evidence was not likely to evoke an emotional bias against the defendant, especially given its relevancy to the issues at trial and the limitations placed on the questions by the trial court. It was therefore properly admitted.

### Defendant Received a Fair Trial

We likewise reject defendant's claim that admission of this evidence rendered his trial fundamentally unfair in violation of his right to due process. As we have explained, the evidence of defendant's sexual preferences was relevant to the issues at trial and had very little, if any, prejudicial value. Thus, the prosecutor's limited questioning on this topic did not render defendant's trial fundamentally unfair. (*People v. Falsetta, supra,* 21 Cal.4th at p. 913 ["The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair"].)

24

## CALCRIM No. 302

CALCRIM No. 302 instructs the jury on how to evaluate conflicting witness testimony at trial. Defendant claims, and the People agree, that because there was conflicting testimony between the victims and the defendant on whether defendant committed the charged crimes, the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 302 and erred by failing to do so.

The parties disagree, however, on whether this error was harmless and argue over whether the instructions that were given provided sufficient guidance to the jury on how to appropriately evaluate the conflicting evidence. They also disagree on whether the omission of CALCRIM No. 302 was prejudicial when the prosecution presented three victim witnesses and the defense only presented one.

We agree with the parties that the trial court erred in failing to sua sponte instruct the jury with CALCRIM No. 302. The error, however, was harmless.

Applicable Law

CALCRIM No. 302 provides, "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point."

CALCRIM No. 302 must be given as an instruction in every criminal case where there is conflicting testimony. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884-885 [discussing CALJIC No. 2.22, the predecessor to CALCRIM 302]; *People v. Anderson* (2007) 152 Cal.App.4th 919, 939.) Failure to give the instruction is prejudicial, however,

only where there is a reasonable likelihood that the error caused juror misunderstanding. (*People v. Snead* (1993) 20 Cal.App.4th 1088, 1097, overruled on other grounds in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 181.)  In applying this standard, we consider the entire record and the totality of the instructions given by the trial court. (*Snead, supra*, 20 Cal.App.4th at p. 1097.)

<u>The Jury was Adequately Instructed on Evaluating Witness Testimony</u>

The conflicting testimony on whether defendant sexually molested the victims required the trial court to instruct the jury with CALCRIM No. 302.  However, the trial court's failure to do so was not prejudicial since there is no reasonable likelihood that the omission led to juror misunderstanding.

Here, the jury was instructed with CALCRIM Nos. 220 on reasonable doubt; 223 on direct and circumstantial evidence; 225 on circumstantial evidence for intent or mental state; 226 on witnesses; 300 on all available evidence; and 301 on single witness testimony.  As relevant here, these instructions collectively instructed the jury to compare and consider all the evidence that was received throughout the entire trial (CALCRIM No. 220); to decide whether a fact in issue has been proven based on all the evidence, including both direct and circumstantial evidence (CALCRIM No. 223); to conclude that defendant did not harbor the requisite mental state if two or more reasonable conclusions from the circumstantial evidence on the existence of intent could be drawn (CALCRIM No. 225); not to automatically reject testimony because of inconsistencies or conflict (CALCRIM No. 226); that neither side is required to call all witnesses who may have information about a case (CALCRIM No. 300); and that the testimony of a single witness can prove any fact (CALCRIM No. 301).  These other standard instructions provided sufficient guidance to the jury in its consideration and evaluation of the conflicting evidence.  (*People v. Snead, supra,* 20 Cal.App.4th at p. 1097.)  Thus, there was no

reasonable likelihood of juror misunderstanding caused by the omission of CALCRIM No. 302. (*Ibid.*)

We also reject defendant's argument that the omission of CALCRIM No. 302 was prejudicial because the jurors heard testimony from three prosecution witnesses and only one defense witness. According to defendant, it would be "natural" for jurors to believe a majority of witnesses over a single witness, and so the verbiage in CALCRIM No. 302 that prohibits them from simply counting the number of witnesses was "critical" here.

While there were three victim witnesses for the prosecution and only defendant testified for the defense, there is nothing in the record to suggest that the jurors would have reached a different result at trial had they been instructed with CALCRIM No. 302. In addition to the aforementioned instructions on the proper assessment of conflicting witness testimony, the prosecution did not advocate any improper ground for the jury to reject defendant's testimony simply because of the number of witnesses who testified on each side. The prosecutor argued during closing: "Not one, not two, but three different victims who don't know each other, virtually have no relationship to each other, coming out at different periods of time saying he molested them and sperm is found in one of them. Let that sink in. Think about what the evidence is telling you." These statements urged the jury to find the victims to be credible; they did not suggest that the jury convict defendant based only on the number of witnesses on either side.

It is therefore not reasonably probable that that jury would have reached a different result had CALCRIM No. 302 been given. The trial court's error in failing to give the instruction is therefore harmless.

*V*

*CALCRIM No. 330*

CALCRIM No. 330 assists the jury in evaluating the testimony of a child who is 10 years old or younger. Here, none of the witnesses were under 10 when they testified

27

at trial. However, A.D. made statements to law enforcement when she was eight years old and those statements were admitted at trial.

The parties discussed CALCRIM No. 330 and agreed to modify it to address A.D.'s statements. The jury was therefore instructed as follows: "You have heard statements from a child who is age ten or younger. As with any other witness, you must decide whether the child made truthful and accurate statements. In evaluating the child's statements, you should consider all the factors surrounding those statements including the child's age and level of cognitive development. When you evaluate the child's cognitive development, consider the child's ability to perceive, understand, remember, and communicate. While the child and adult witness may behave differently, that difference does not mean that one is more or less believable than the other. You should not discount or distrust the statement of a witness just because he or she is a child." The word "statement" replaced "testimony" in the standard instruction; there were no other modifications.

Defendant now argues on appeal that this modified instruction was erroneous because CALCRIM No. 330 is not applicable to out-of-court statements. He further claims that the instruction violated his right to present a defense and a fair trial because it improperly bolstered the victims' testimonies.

The People argue that defendant forfeited this claim because he agreed to the modified instruction. On the merits, the People contend that the instruction was correct because it was responsive to the evidence presented at trial, and any error was harmless.

We agree with the People that defendant forfeited his ability to challenge CALCRIM No. 330 because he joined the prosecutor's request for the modified instruction. However, we will nonetheless consider his appellate claim based on his contention that he received ineffective assistance of counsel for his attorney's failure to object to the instruction. (*People v. Hardy, supra,* 2 Cal.4th at p. 209.)

28

Applicable Law

Section 1127f provides: "In any criminal trial or proceeding in which a child 10 years of age or younger testifies as a witness, upon the request of a party, the court shall instruct the jury" with CALCRIM No. 330. "[T]he California Supreme Court characterized the Legislature's enactment of Penal Code section 1127f…as adopting the modern view of criminal jurisprudence that rejects traditional notions of child witnesses as susceptible to leading questions, incapable of recalling prior events accurately, and neither reliable nor truthful." (*People v. McCoy* (2005) 133 Cal.App.4th 974, 978-979, fns. omitted.)

"In charging the jury the court may instruct the jury regarding the law applicable to the facts of the case, and may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the case...." (§ 1127.) A court may give a cautionary instruction " 'relating to certain kinds of evidence and witnesses ... where necessary to protect ... against mistake or unwise action by the jury.' " (*People v. Sutton* (1964) 231 Cal.App.2d 511, 515.)

We apply the de novo standard to independently review whether a jury instruction accurately states the law. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206; *People v. Posey* (2004) 32 Cal.4th 193, 218.)

The Modified Version of CALCRIM No. 330 is Responsive to the Evidence at Trial

The trial court did not err by giving the modified version of CALCRIM No. 330. Here, A.D. was interviewed in 2004 when she was eight years old by police officer Mitchel Marquez. Officer Marquez testified at trial about A.D.'s interview. The jury was therefore required to consider and evaluate the statements made by A.D. when she was under10 years old. As a result, the trial court appropriately gave the modified

29

version of CALCRIM No. 330 because it accurately reflected the evidence presented at trial.

It does not matter that this instruction is typically given when a child testifies on the stand at trial. Indeed, "[t]rial courts ... are not bound by the suggested language of the standard [jury] instruction and are free to adapt it to fit the circumstances of the case...." (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 12.) The modified version of CALCRIM No. 330 fits the circumstances presented here.

Because there was no error in instructing with the modified version of CALCRIM No. 330, we reject defendant's alternative argument that his trial counsel was ineffective for failing to object to that instruction. (*People v. Poslof, supra,* 126 Cal.App.4th at p. 99.)

Defendant Received a Fair Trial

We also reject defendant's claim that he did not receive a fair trial or an opportunity to present a defense because the jury instruction bolstered A.D.'s credibility. CALCRIM No. 330 "neither ' "lessen[s] the government's burden of proof" ' " nor ' "instructs the jury to unduly inflate the testimony of a child witness." ' " (*People v. McCoy, supra*, 133 Cal.App.4th at p. 979.) " 'The instruction tells the jury not to make its credibility determinations solely on the basis of the child's "age and level of cognitive development," but at the same time invites the jury to take these and all other factors surrounding the child's testimony into account. The instruction provides sound and rational guidance to the jury in assessing the credibility of a class of witnesses as to whom " 'traditional assumptions' " may previously have biased the factfinding process. Obviously a criminal defendant is entitled to fairness, but just as obviously he or she cannot complain of an instruction the necessary effect of which is to increase the likelihood of a fair result.' " (*Ibid.*)

*VI*

*Prosecutorial Misconduct*

Defendant raises various claims of prosecutorial misconduct made during closing arguments. As defendant acknowledges, his attorney failed to object to all but one of the alleged claims of error, and he did not request an admonition for any of the errors. These claims are therefore forfeited. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' "])

However, we will once again consider defendant's appellate claims based on his contention that he received ineffective assistance of counsel for his attorney's failure to object to the prosecutor's closing argument and ask for an admonition. (*People v. Hardy, supra,* 2 Cal.4th at p. 209.)

Applicable Law

Under the federal Constitution, conduct by the prosecutor constitutes prosecutorial misconduct if it " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.) Under California law, misconduct occurs "when a prosecutor uses ' " ' "deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070-1071.)

Comments About Defense Counsel

Defendant complains that the prosecutor engaged in misconduct when he made four separate comments about defense counsel during closing argument. The first challenged comment was made while the prosecutor addressed K.D.'s attitude towards the defense attorney during cross-examination. The prosecutor acknowledged that K.D. had been "snippy" with defense counsel. On this point, the prosecutor said, "She did not

31

like Mr. Farina.  …  But can you blame her, being crossed by a defense attorney of the man who molested you, being called a liar?"  Defense counsel objected to this comment and the trial court instructed the prosecutor to move on.

The second challenged comment occurred at the beginning of the prosecutor's rebuttal argument when he addressed defense counsel's statement in his closing argument that he was proud to represent defendant.  The prosecutor said, "Well, I'm glad for Mr. Farina that he's proud to have this man as his client.  It's very clear from his closing that we were not watching the same trial.  I have already given my closing.  I have already talked about a lot of what Mr. Farina argued.  I told you what he was going to argue, and he sure as heck did it."

The third challenged comment was also made during rebuttal closing when the prosecutor addressed defense counsel's characterization of K.D. as an "unstable prostitute."  The prosecutor rhetorically asked, "How offensive is that?"

The fourth challenged comment occurred at the end of the rebuttal closing argument when the prosecutor responded to defense counsel's articulation of the reasonable doubt standard.  The prosecutor said, "And last, Mr. Farina talked about reasonable doubt, and defense attorneys almost always do this, and they say it's the highest standard.  And it is."  Defendant takes issue with the prosecutor's comment, "defense attorneys almost always do this…"

None of these comments rise to the level of misconduct by the prosecutor.  "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel.  [Citations.]  'An attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable.' "
(*People v. Hill, supra,* 17 Cal.4th at p. 832.)

The challenged comments made by the prosecutor about defense counsel did not serve to attack counsel's integrity or reputation.  The prosecutor's statements about

32

K.D.'s reactions to the defense attorney's questions on cross-examination were the prosecutor's attempt to rehabilitate K.D.'s credibility and reputation amongst the jurors since she had been "snippy" with defense counsel. The prosector urged the jurors to sympathize with K.D.'s "snippy" reaction because defense counsel called her testimony into question; in other words, he called her a liar. We fail to see how these comments attacked counsel's integrity.

The same is true for the other challenged comments. The prosecutor did not personally attack the defense attorney in any of them. Instead, he responded to comments made by defense counsel in his own closing argument. In response to defense counsel's expressed pride in representing defendant, the prosecutor called that position into question given the strength of the evidence presented at trial. A prosecutor is permitted to make comments based upon the state of evidence. (*People v. Steskal* (2021) 11 Cal.5th 332, 351.)

After defense counsel called K.D. an "unstable prostitute," the prosecutor commented on the offensive nature of that statement. This was not a personal attack on the defense attorney; rather, it was an appropriate response by the prosecutor to counsel's characterization of K.D. Nor was the prosecutor's comment that defense attorneys "always" emphasize the strength of the reasonable doubt standard an attack on counsel's integrity or reputation.

Accordingly, none of these comments rendered defendant's trial fundamentally unfair.

Comments About Defendant

Defendant next challenges a few statements made by the prosecutor about defendant. During closing argument, the prosecutor addressed defendant's demeanor on the stand during his testimony. He said, "And what about the way he answered questions compared to everyone else? Who is the only person who refused to answer yes or no

33

questions?  Who had to explain away every single time I tried to question him about something that wasn't going to be good for him?  He refused to be straight and give you all a straight answer because he's lying.  That is not the demeanor of a man who is being honest with each of you."  Later, after addressing defendant's testimony, the prosecutor said, "He is lying to each and every one of you, and you should be offended."  At the end of rebuttal argument, the prosecutor stated, "Don't let him fool you.  Don't let him lie to you."

The prosecutor's comments on the veracity of defendant's testimony were appropriate here.  A prosecutor has " 'wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it.' "  (*People v. Lamb* (2024) 16 Cal.5th 400, 436.)  Indeed, " ' " '[c]losing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence.' " ' "  (*People v. Nadey* (2024) 16 Cal.5th 102, 186; see *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1074.)  In particular, " '[r]eferring to the testimony ... of a defendant as "lies" is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record.' "  (*People v. Dykes* (2009) 46 Cal.4th 731, 773.)

The prosecutor characterized defendant as a liar based on defendant's inconsistent statements during his testimony and the strength of the evidence presented against him.  No comments were made by the prosecutor based upon his personal experience or evidence outside the record.  Thus, these statements were appropriate.

<u>Comments About the Law</u>

Lastly, defendant complains that the prosecutor made misleading statements about the law when he discussed duress and defendant's personal sex life.  Specifically, defendant argues that the prosecutor incorrectly told the jury that defendant was guilty of

34

forcible lewd acts on M.D. by offering her money in exchange for oral copulation. The prosecutor argued, "But there is also this duress. The use of direct or implied threat of force, violence, danger or hardship to cause a reasonable person to submit. Now, what does he -- what else does he do during that time? She actually doesn't want to do it, right? She does not want to suck his penis. He bribes her. He pulls out money. What happens when someone is being bribed? They go through that internal struggle, that internal hardship. They weigh a cost and benefit whether this act I don't want to do whether it's worth the money. That's hardship. And the less access to money you have, like a child, the more that hardship increases, and it outweighs her not wanting to do that. He bribes her. He creates that hardship. And she submits and gives in. So he is using both fear and duress to get her to do what he wants and she does." According to defendant, this argument misstates the law of duress because offering money does not create a hardship.

Defendant also contends that the prosecutor misstated the law when he "led the jurors to believe that they could consider [defendant]'s perfectly legal sexual activities as an adult as propensity evidence." In discussing defendant's lack of credibility, the prosecutor argued, "This is a man who has multiple sexual partners all the time, who wants sex. Wants sex with Dietra. Wants sex with Leslie. Wants sex with his sidepiece. Wants sex with all these people. Has porn in the living room in his house. Masturbates when people are home. There's nothing wrong with having porn or masturbating or that it's illegal or anything wrong with it. It shows his mindset and shows what type of person he is. He is very sexually driven. He engaged with prostitutes, clearly, ladies and gentlemen. So that shows more than just [A.D.] is telling the truth about the scenario. It shows the type of person he is."

"It is prosecutorial misconduct to misstate the law. [Citation.] It is also misconduct to misstate the evidence or go beyond the record. [Citations.] However, the prosecution 'enjoys wide latitude in commenting on the evidence, including the

35

reasonable inferences and deductions that can be drawn therefrom.' [Citations.] 'A defendant asserting prosecutorial misconduct must ... establish a reasonable likelihood the jury construed the remarks in an objectionable fashion.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 204.)

Neither of the challenged arguments misstate the law. The prosecutor accurately defined duress for the jury as a "direct or implied threat of force, violence, danger or hardship to cause a reasonable person to submit." (*People v. Leal, supra,* 33 Cal.4th at pp. 1004-1005, 1010.) Based on this legally correct definition, the prosecutor argued that M.D. orally copulated defendant because of the monetary bribe, which—under the context of the facts here—created a hardship for her. He summarized that M.D. ultimately acquiesced to defendant's demands because of both duress and fear created by the bribe. As we previously explained, M.D. was in all likelihood simultaneously motivated by money and fear of punishment, both of which are sufficient to prove forcible lewd and lascivious acts under section 288, subdivision (b). The prosecutor's argument on this point was fair comment on the evidence in the context of the correct legal definition of duress.

The same is true for the prosecutor's argument regarding defendant's sex life. The prosecutor was required to prove beyond a reasonable doubt that defendant touched the victims "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child…." (§ 288, subd. (a).) The prosecutor's summary of defendant's sex life served that purpose because it connected defendant's sexual preferences with the crimes, showing that he molested the victims with the specific intent required. This argument utilized the evidence of defendant's sexual preferences for the proper purpose of proving the requisite intent.

## VII

### *Cumulative Error*

Defendant argues the cumulative impact of the trial court's evidentiary and instructional errors, as well as the prosecutorial errors, denied his right to a fair trial. While we agree with the parties that the trial court erred by failing to instruct the jury with CALCRIM No. 302, the error was harmless. We find no prejudicial errors here to be cumulated.

### DISPOSITION

The judgment is affirmed.

/s/
HULL, Acting P. J.

We concur:

/s/
RENNER, J.

/s/
BOULWARE EURIE, J.

37